553 So.2d 971 (1989)
Freddie BOWMAN
v.
F. CHRISTIANA AND COMPANY, INC., Lumbermen's Mutual Casualty Company, ABC Insurance Company.
No. 89-CA-0010.
Court of Appeal of Louisiana, Fourth Circuit.
November 16, 1989.
*972 James E. Cazalot, Jr., H. Edward Sherman, New Orleans, for plaintiff/appellant.
Terry M. Boudreaux, Roberte A. Pitre, Jr., Gretna, for defendant/appellant.
Collins C. Rossi, Bailey & Rossi, Metairie, Joseph F. Clark, Jr., Lewis & Caplan, New Orleans, for defendant/appellee.
Before BARRY, BYRNES and ARMSTRONG, JJ.
ARMSTRONG, Judge.
Plaintiff, Freddie Bowman, instituted this action seeking worker's compensation benefits. In addition, he sought a civil penalty from defendant, F. Christiana and Company (Christiana), his former employer, for allegedly terminating him solely because he filed a worker's compensation claim. Also named as defendants were Lumberman's Mutual Casualty Company (Lumberman), and St. Paul's Surplus Lines Insurance Company (St. Paul's).
Plaintiff had been employed by Christiana for approximately two and a half years when, on January 2, 1983, he cut his hand on a band saw while cutting pork chops; Christiana is a meat distributor. Plaintiff was treated by a physician, at the cost of Christiana, until March 31, 1983, when he was released to return to work. In the interim he received worker's compensation benefits.
On April 22, 1983, plaintiff fractured the same hand that had been previously injured, when a case of chickens fell on him. He was treated by an orthopedic surgeon and released to return to work on June 2, 1983. In the interim he received money directly from Christiana, and later, received worker's compensation benefits.
On June 2, 1983, or the early morning hours of June 3rd, plaintiff showed up at Christiana for his usual night shift. At that time he was terminated for the stated reason, lack of work. Plaintiff subsequently filed this suit.
*973 The trial court found that plaintiff was entitled to partial disability benefits under La.R.S. 23:1221(3), in the amount of $146.67 for a period of 450 weeks, subject to a credit of $120.00 per week for the period of June 3, 1983 through June 12, 1988, and subject to weekly credits for sums actually earned by him after June 12, 1988. It was further found that plaintiff was terminated solely for the reason that he filed a worker's compensation claim. Pursuant to La. R.S. 23:1361, he was awarded $7,214.07. Attorney's fees were also awarded in the amount of $1,082.11, representing 15% of the penalty.
On appeal various parties claim that the trial court erred in:
1. Finding that Christiana discharged plaintiff because he filed a worker's compensation claim;
2. Not awarding plaintiff a full year's salary for the wrongful termination, as allowed under La.R.S. 23:1361(C);
3. Awarding only $1,082.11 in attorney's fees for the wrongful termination claim;
4. Failing to award plaintiff workers' compensation benefits under the "Odd Lot Doctrine";
5. Calculating partial disability benefits;
6. Failing to assess as costs of court, the fees of Drs. Scrignar and Manale.

1. WRONGFUL TERMINATION
The evidence showed that plaintiff was terminated after he returned to work following his recovery from his second accident, where he fractured his hand. The stated reason for the termination, as evidenced by the testimony of, among other witnesses, the president of Christiana, was lack of work. However, as correctly found by the trial court, in the months following plaintiff's termination, Christiana hired a number of other workers for the same position that he had held. Two of these men were hired the week plaintiff was terminated. Two were also hired the next month.
Several witnesses, current and former employees of Christiana, testified that the business was seasonal. According to these witnesses, in the summer, when schools are not in session, the volume of business decreases. There was testimony that it was not uncommon for employees to be let go, and later, when business picked up, be rehired. However, Nick Christiana, who worked for Christiana from 1972 to 1983, was asked whether work ever slowed to the point that they could not hire people. He replied "[t]hat would bewould not be the case. It is usually always busy. We would either be busy or real busy". We note that in plaintiff's approximately two and a half years with Christiana, he had apparently never been terminated for lack of work.
Plaintiff testified that a fellow worker told him that Christiana did not re-hire workers who were injured on the job. However, at trial that worker denied having made such a statement. That worker also testified that he had been injured on the job on more than one occasion, but had only been fired once, for allegedly drinking on the job. He did not say whether or not he had ever filed a worker's compensation claim in connection with any of his injuries. Another current worker at Christiana testified that he had sustained three or four work-related injuries in the past. He had filed one worker's compensation claim and stated that he had never been fired.
There was some evidence introduced indicating that plaintiff had been intoxicated at work on occasion. This evidence was apparently introduced in order to establish another cause for plaintiff's termination. However, we give no credence to this evidence insofar as it might establish such an independent cause. The president of Christiana, as well as other witnesses, maintained that plaintiff was terminated for lack of work. The possibility that plaintiff was terminated for his drinking was, therefore, excluded.
La.R.S. 23:1361(B) provides that "[n]o person shall discharge an employee from employment because of said employee having asserted a claim for benefits under the provisions of this Chapter or under the law of any state or of the United States." The statute creates a civil cause of action as to which the normal burden of proof applies. *974 The fact sought to be proved must be established by a reasonable preponderance of the evidence. Proof by a preponderance of the evidence requires that, taking the evidence as a whole, it shows the fact sought to be proved to be more probable than not. Moore v. McDermott, Inc., 494 So.2d 1159 (La.1986). The finding by the trial court that plaintiff was terminated because he filed a worker's compensation claim is a finding of fact. An appellate court should not disturb the factual findings of the trial court, both express and implicit, unless they are clearly wrong. Virgil v. American Guarantee and Liability Insurance Company, 507 So.2d 825 (La. 1987).
In 1983 the plaintiff filed two worker's compensation claims within six months. There was testimony by one witness that the plaintiff had been injured in 1982. Plaintiff denied having had this 1982 accident, and there is no evidence that a worker's compensation claim was filed in connection with it. Christiana submits that it would not have paid the plaintiff funds after the second accident, instead of having him file a worker's compensation claim, if it had intended to terminate him. However, Christiana's action in at first paying plaintiff out of its own pocket can be interpreted to show that it would have preferred that plaintiff not have filed a worker's compensation claim. We note that one of the other workers testified that out of his three or four injuries on the job, he only filed one compensation claim. Later, plaintiff filed a compensation claim for the second accident, and upon his return to work, he was terminated. A former bookkeeper at Christiana did testify that he knew of no employee who was not "re-hired" after receiving an injury because of his having filed a worker's compensation claim.
Christiana claims that plaintiff did not exclude all reasonable hypotheses as to why he was terminated. We believe that Christiana itself, by the testimony of its own employees, excluded any cause for plaintiff's termination except for lack of work. The evidence furnishes a basis for a finding that there was work available. Reviewing the record evidence as a whole, we are unable to say that the trial court was clearly wrong in finding that plaintiff proved that it was more probable than not that he was terminated solely because he filed a worker's compensation claim.

TERMINATION AWARD
La.R.S. 23:1361(C) provides that in cases involving wrongful termination, the employee "shall be entitled to recover from the employer ... who has violated the provisions of this Section a civil penalty which shall be the equivalent of the amount the employee would have earned but for the discrimination based upon the ... earnings of the employee at the time of the discharge... but not more than one year's earnings, together with a reasonable attorney's fee."
The trial court awarded plaintiff a penalty in the amount of one-half of the yearly salary he was apparently earning at the time of his termination. On appeal he argues that the trial court erred in failing to award a penalty in the amount of his full year's salary, as permitted by the statute. The plain language of the statute reads to mandate, in a case such as the one at bar, a penalty based upon the earnings of the employee at the time of discharge. The only limitation on the amount of the penalty is that it cannot be any greater than one year's earnings.
The Louisiana jurisprudence reflects that where the employee makes a showing that he or she has been wrongfully terminated under La.R.S. 23:1361(B), the penalty assessed and awarded is always a full year's earnings. See Ducote v. J.A. Jones Construction Company, 471 So.2d 704 (La. 1985); Layssard v. Proctor & Gamble Manufacturing Company, 532 So.2d 337 (La.App. 3rd Cir.1988); Moore v. McDermott, Inc., 504 So.2d 982 (La.App. 1st Cir. 1987); Guye v. International Paper Co., Inc., 488 So.2d 1108 (La.App. 2d Cir.1986); Turner v. Winn Dixie Louisiana, Inc., 474 So.2d 966 (La.App. 5th Cir.1985), writ denied, 478 So.2d 147 (La.1985); Collier v. Pellerin Milnor Corporation, 463 So.2d 47 (La.App. 5th Cir.1985); Wiley v. Missouri Pacific Railroad Company, 430 So.2d *975 1016 (La.App. 3rd Cir. 1982), writ denied, 431 So.2d 1055 (La.1983).
There are no reported cases where a court has assessed or awarded a penalty in an amount less than one full year's salary. Nevertheless, a reading of the statute indicates that the drafters intended to bestow upon the trial court a measure of discretion in the calculation of the penalty.
Several statutes provide for indeterminate civil penalties with a set maximum. See La.R.S. 3:3309 (up to $25,000.00 per violation for contaminating state waters); La.R.S. 32:765 (up to $500.00 or $1,000.00 per day for first and second violations, respectively, for violating laws relating to the dismantling of automobiles for parts); La.R.S. 51:1418 (up to $5,000.00 per violation for engaging in unlawful trade practices); La.R.S. 56:2012 (up to $1,000.00 for each violation of dredging laws). As in cases involving criminal penalties, it could not reasonably be argued that the trial court is somehow bound to assess the maximum penalty for violations of these statutes. The trial court is vested with the discretion to vary the penalty according to the peculiar circumstances of the case at hand. One factor which might reasonably affect the assessment of the penalty is the past record of the violator. Certainly, a business which has a record of repeatedly engaging in unfair trade practices can expect to receive a stiffer penalty than a first time violator.
A major distinction between these statutes providing for civil penalties and the civil penalty provided by R.S. 23:1361, is that in the former the penalty goes to the state, while in the latter the penalty goes to the aggrieved worker. The legislature deemed that the worker receive the benefit of the penalty, rather than the state. The statute has a dual purpose, it provides a remedy to the wrongfully terminated employee, and it acts to discourage such terminations, thus allowing employees the freedom to exercise their right to workers compensation benefits.
La.R.S. 23:1361 gives the trial court a degree of discretion in assessing the penalty. The dispositive issue is whether or not the trial court abused its discretion in assessing the penalty. In the instant case there was no evidence that Christiana had ever terminated a worker for filing a workers compensation claim. Thus, the trial court could have felt that the maximum penalty was not warranted for this first violation. Under these circumstances we cannot say that the trial court abused its discretion in assessing a penalty of only one-half of plaintiff's yearly earnings at the time of his dismissal.

ATTORNEY'S FEES
The trial court fixed attorney's fees at 15% of the amount awarded as a civil penalty under La.R.S. 23:1361(C). This amounted to $1,082.11. A trial judge is vested with broad discretion in fixing attorney's fees under R.S. 23:1361. Absent a clear abuse of discretion in making such assessment, his determination should not be disturbed. Turner v. Winn Dixie Louisiana, Inc., 474 So.2d at 970.
In making a determination as to a proper award of attorney's fees a court should consider:
"(1) the ultimate result obtained; (2) responsibility incurred; (3) the importance of the litigation; (4) the amount involved; (5) the extent and character of the labor performed; (6) the legal knowledge and attainment and skill of the attorney; (7) the number of appearances made; (8) the intricacies of the facts and law involved; (9) the diligence and skill of counsel; (10) the Court's own knowledge."

Turner, 474 So.2d at 970.
Plaintiff prevailed in both the lower court and this court on the issue of wrongful termination. Plaintiff's counsel, or his firm, handled the case at every stage of the proceedings. The litigation was not only important to the plaintiff, but also, as matter of public policy, to all workers covered by the Louisiana Worker's Compensation Law. The amount sought under the statute was significant to the plaintiff. Counsel met a heavy burden in proving that plaintiff was wrongfully terminated. The trial transcript and record reflect that *976 plaintiff's counsel was well versed in the applicable law and was a skilled trial attorney. Plaintiff's counsel attended at least two depositions, and the duration of the trial was two days. The record shows that counsel diligently prosecuted plaintiff's claim. Counsel also filed a thoroughly researched appellate brief.
Considering all of these factors, it does appear that the trial court's award of only $1,082.11 in attorney's fees was patently low and an abuse of its discretion. Having determined that the trial court abused its discretion in making the award of attorney's fees, we may consider other awards under R.S. 23:1361 as an aid to determining a proper award. All of the following awards were more than twice as much as the award made by the trial court in the case at bar. Ducote v. J.A. Jones Construction Company, 471 So.2d at 705 ($2,500). Layssard v. Proctor & Gamble Manufacturing Company, 532 So.2d at 343 ($7,500.00); Moore v. McDermott, Inc., 504 So.2d at 983 ($5,000.00); Guye v. International Paper Company, Inc., 488 So.2d at 1111 ($4,500.00); Turner v. Winn Dixie Louisiana, Inc., 474 So.2d at 969 ($5,000.00); Collier v. Pellerin Milnor Corporation, 463 So.2d at 47 ($2,500.00); Wiley v. Missouri Pacific Railroad Company, 430 So.2d at 1017 ($3,500.00).
Considering all of the previously-mentioned factors, and the reported attorney fee awards under R.S. 23:1361, we feel that the trial court should not have awarded less than $2,500.00 in attorney's fees to plaintiff. We amend the judgenment of the trial court to award plaintiff $2,500.00 in attorney's fees.

ODD-LOT DOCTRINE
La.R.S. 23:1221(2), as in effect at the time of plaintiff's injuries, provided for compensation benefits:
"For injury producing permanent total disability of an employee to engage in any gainful occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee, at the time of injury, was particularly fitted by reason of education, training, and experience, sixty-six and two-thirds per centum of wages during the period of such disability."
The issue in cases where an employee claims entitlement to compensation under this section is whether the employee is permanently and totally disabled from "engaging in any gainful occupation for wages" within the meaning of the statute. The issue is to be determined by application of the "odd-lot" doctrine. Oster v. Wetzel Printing Inc., 390 So.2d 1318 (La.1980); Barrios v. Rheem Manufacturing Company, 410 So.2d 862 (La.App. 4th Cir. 1982). At the time of plaintiff's injuries the odd-lot doctrine was still meaningful, i.e., La. R.S. 23:1221(1)(b) had not yet been added to the statute.
In Oster, 390 So.2d at 1323, 1324, the Louisiana Supreme Court set forth the criteria for application of the odd-lot doctrine as follows:
"In order to determine whether the plaintiff fits within this category of odd lot workers, he must show that because of his physical impairment, mental capacity, education, training, age, availability of employment in his area, and any other relevant factor, that he `cannot perform the substantial and material parts of some gainful work or occupation with reasonable continuity.' If the plaintiff is successful in showing a combination of factors indicating that the services which he is able to render are so limited in quality, quantity, or dependability that a market for his labor does not exist within which he can effectively compete, he has presented a prima facie case for classification in the odd-lot category. An offering of such proof by the plaintiff, therefore, satisfies his burden of proving that he should be awarded benefits for permanent and total disability. The defendant employer then has the onus of showing that there are jobs which are available to provide a steady income to the plaintiff or that will provide him with `a gainful occupation.'" (citation omitted)
*977 In the instant case, as in the Oster case, evidence was presented both as to physical limitations on the plaintiff's ability to work, and limitations placed on him because of his mental state. Dr. Bernard Manale, an orthopedic surgeon, first examined the plaintiff in August, 1983, some four months after he fractured his hand, and after he had been terminated. He testified that the injury to plaintiff's hand caused him to have a shortened right index finger. He stated that the plaintiff had arthritis in that joint. He also had diminished sensation in his right long finger, as well a loss of pulp in it. Dr. Manale noted some apparent atrophication of the muscles of plaintiff's right arm, and diminished grip strength in his right hand as compared with his left one. At one point he stated that he did not feel that plaintiff could go back to an occupation which required a forceful grip of his right hand. He felt that plaintiff would not benefit from surgery, and that he "probably" had a permanent disabilitya ten percent impairment of his right hand. Dr. Manale saw plaintiff in March, 1984, and again in May, 1988, the month before trial. His diagnosis essentially remained unchanged.
Dr. L. Thomas Cashio, an orthopedic surgeon, treated plaintiff after both of his hand injuries. In contrast to the testimony of Dr. Manale, Dr. Cashio stated, in a March, 1984 report, that the plaintiff had no arthritis in the joint of his right index finger. He also stated that plaintiff suffered no residual disability of his right hand because of the fracture. He admitted, however, that he had not performed a grip strength test on the plaintiff.
Plaintiff testified that after he was terminated he worked for a construction company as a laborer, but had to quit because he could not properly perform his duties because of his hand. He later drove and operated a tow truck, despite the pain in his hand. That job lasted for approximately three or four weeks. He left because his hand was bothering him, and he said, because of a lack of work. He subsequently drove a dump truck for a hauling company which had a contract to haul trash from two local housing projects, where renovation work was being done. Plaintiff said that because of the second accident, where he cut his hand on the band saw while cutting porkchops, he has an aversion to working near some types of machinery. Therefore, he said he couldn't drive the truck near the mortar mixing machine, and had to get someone else to do it. At the time of trial he was working for his brother doing landscape work. He had also worked for his brother in between some of the previously-mentioned jobs. He was able to cut grass with a lawnmower but could not operate a chainsaw because of his aversion to machinery. He said that he would leave and wait in the truck when his brother would use the chainsaw.
Plaintiff testified that he had recurring visualizations of the accident where he cut his hand. But, he stated that the only limitation he has on working is lifting heavy objects. He said that he had applied for jobs at two local grocery stores for the positions of stock clerk and porter, and he felt that he could perform those jobs.
Plaintiff testified that his social life had changed since he was terminated. He said he doesn't "get out anymore". He also said that other people have noticed a change in him. Plaintiff's brother confirmed this, and said that the plaintiff doesn't socialize anymore.
Dr. Chester B. Scrignar, a psychiatrist, examined plaintiff on seven occasions. Dr. Scrignar is the author of a textbook on "post traumatic stress syndrome" (PTSD), and testified that he had been previously qualified in Louisiana state courts as an expert in the area of PTSD. He testified that the plaintiff was suffering from PTSD as a result of the accidents. In addition to the PTSD, he found plaintiff to be suffering from chronic depression. He said that the plaintiff had been "essentially" disabled, "in a psychiatric sense", since 1983. Plaintiff's condition was such, at the time of trial, that Dr. Scrignar felt that he could not work for a prolonged period of time at any job whatsoever. He felt that the plaintiff should not have returned to work after the first accident where he cut his hand on *978 the band saw. He also stated that plaintiff's prognosis was "guarded at best".
His opinion was based on information provided by the plaintiff, and interviews with plaintiff's brother and a friend of some fifteen years. Dr. Scrignar maintained that plaintiff gave no indication of exaggerating or giving false answers on the diagnostical questionnaires. When asked whether his opinion of plaintiff would change if he discovered that plaintiff did not tell him that he had worked a number of jobs since the accident (which he didn't), Dr. Scrignar said that he would wonder why plaintiff did not tell him, and said that it would go to plaintiff's credibility.
While Dr. Scrignar seemed to agree that the plaintiff's inability to get a good job after moving to New Orleans from St. Louis, Missouri in 1978, and the breakup of his marriage, could have affected his state of mind, he maintained that the accidents were the significant events bringing about plaintiff's present psychiatric condition.
Dr. John W. Bick, a psychiatrist, also testified as to plaintiff's mental condition. He examined plaintiff on two occasions in January, 1985. He found plaintiff to be suffering from a "rather severe, major, depressive disorder characterized by pervasive feelings of depression and low self-esteem, loss of energy in virtually all activities, as well as severe insomnia and significant decrease in appetite." However, in contrast to Dr. Scrignar, Dr. Bick felt that the stress event experienced by the plaintiff was not sufficient enough to precipitate PTSD. He did not find plaintiff to be suffering from PTSD for that reason, and also, because the plaintiff did not "re-live" the event sufficiently enough. He found a lack of "intrusive" thoughts about the accidents. Although he found the plaintiff to be suffering from depression, as with the PTSD, he did not feel that the accidents constituted a psychological trauma suffient to precipitate it. Dr. Bick admitted that he did not specialize in treating persons with PTSD; he had only treated "probably six or seven" persons with the condition.
When asked whether he would send the plaintiff back to work at a place such as Christiana's Dr. Bick replied, "[t]hat is difficult to say. If pressed, I would say probably not in the state that I saw him". Dr. Bick offered no direct opinion as to plaintiff's employability elsewhere.
Dr. Craig L. Feldbaum was qualified both as an expert in psychology and in vocational rehabilitation. He evaluated the plaintiff three times, once in January, 1986, and twice in June, 1988, the month of trial. He also reviewed medical reports of Drs. Cashio, Bick, Scrignar, and Manale. Dr. Feldbaum stated that plaintiff was a seriously emotionally agitated man and had a serious "reactive" depression. He said the accident was not the kind of trauma to which he would expect to see such a "huge emotional reaction", although he saw it. At the time he first saw plaintiff, in 1986, he wondered, because of the way plaintiff acted, whether he would be able to sustain employment. He said that the evaluations in June, 1988, revealed that plaintiff was more depressed than he had been in 1986, but that he tended more towards denial of his problems.
He thought that the plaintiff would have a difficult time maintaining a rapport with supervisors and co-workers. He foresaw a problem if plaintiff had to deal with people or work in a closed environment. He said if the employer is willing to accommodate him and allow him to go home or take a break to calm down, that he could be okay. However, he stated that at a certain point the necessary accommodation goes beyond what a normal employer would do. At such a point, he said, it is not typical competitive employment. He felt that plaintiff's employment with his brother doing landscaping work was a "great" type of job for a person with his present problems. Because of plaintiff's emotional problems, Dr. Feldbaum thought that the plaintiff would have unstable future employment.
Despite the dismal outlook painted by Dr. Feldbaum, he stated that he wasn't saying that plaintiff is removed from the competitive marketplace. He thought that the plaintiff could go back to work as truck *979 driver because in such a job he would work alone.
Plaintiff's history, as given to Dr. Feldbaum, shows that plaintiff was a high school graduate who had been an average student. He was a construction worker for six or seven years after graduation. He apprenticed as a carpenter and became a journeyman. Three months later he became a foreman over a group of up to forty men. He worked as a foreman for approximately nine years. Tests showed plaintiff to be functioning in the low average range of intelligence. But, given the responsibilities of being a foreman, Dr. Feldbaum felt that the tests did not accurately reflect the plaintiff's level of intelligence.
Nancy Favaloro, a vocational rehabilitation counselor, testified on behalf of Christiana and other defendants. She evaluated medical reports from Drs. Cashio, Manale, Bick, Scrignar, and Feldbaum. She said that based upon these reports and plaintiff's history, he was qualified for a number of jobs. However, when asked whether she would recommend employment at any of these jobs if the plaintiff was severely depressed and not receiving psychiatric care, she said that, "at this time", she would not. The evidence established that plaintiff has never received the psychiatric treatment recommended by Drs. Scrignar and Bick.
The trial court accepted the testimony of Dr. Scrignar and plaintiff's brother to establish plaintiff's "injury", and its relation to the accidents. The court found that the two injuries acted to cause the plaintiff to suffer from depression and PTSD. However, referring to the odd-lot doctrine, the court stated that it did "not feel that Mr. Bowman's injuries [met] said test because his PTSD and depression [could] be treated and/or cured by psychological and/or psychiatric treatment."
We feel that the trial court was in error in its reasons for judgement. La.R.S. 23:1221(2) contemplates that the disability can be remedied since it provides for payment of benefits only "during the period of such disability". However, we believe the trial court reached the correct result in finding that plaintiff failed to prove that he was entitled to permanent and total disability benefits under R.S. 23:1221(2) and the odd-lot doctrine. Plaintiff's own testimony belied that of Dr. Scrignar. Besides plaintiff's testimony that he did not like to work around certain types of machinery, he said nothing that would indicate that he could not "perform the substantial and material parts of some gainful work or occupation with reasonable continuity". While it may be true that plaintiff may not be aware of how depressed he really is, if he could work for a year for the trucking company hauling trash and performing all duties required of him except for going near a mortar mixing machine, we feel he has not established a permanent and total disability under the odd-lot doctrine.
We are essentially faced with choosing between the testimony of Dr. Scrignar that plaintiff is disabled from working, and the testimony of the plaintiff himself, who basically says that, with physical limitations because of his hand, and the limitation that he cannot work around certain types of machinery, he is able to work. Overall, plaintiff has some problems which may affect his work. However, considering his testimony and his work record since his accident, we cannot say he is entitled to benefits under R.S. 23:1221(2).

CALCULATION OF PARTIAL DISABILITY BENEFITS
The trial court found that plaintiff had been earning $220.00 per week at Christiana's. It further found that he had been earning $120.00 per week since the accident (on the average). Under La.R.S. 23:1221(3), plaintiff was entitled to 66 2/3 of the difference between the $220.00 and $120.00, or $66.66 per week for a maximum of 450 weeks. In applying the statute as in effect at the time of plaintiff's injury, the trial court erred in giving defendants any type of monetary "credits".

DOCTORS BILLS
On appeal plaintiff seeks payment of the medical bills of Drs. Scrignar and Manale. Defendants maintain that the plaintiff was not treated by these physicians, only examined by them in anticipation *980 of litigation, and thus the expenses are not recoverable.
Under La.R.S. 23:1203, employers and insurers are not liable for medical expenses incurred for purposes of litigation. Caldwell v. Exxon Corporation, 320 So.2d 319 (La.App. 4th Cir. 1975). The physician must furnish some form of treatment for the expenses to be recoverable. Butts v. Insurance Company of North America, 352 So.2d 745 (La.App. 3rd Cir.1977), writ denied, 354 So.2d 206 (La.1978).
We must assume that the trial court found that the services rendered by Drs. Scrignar and Manale were for litigation purposes, and that they provided no treatment to the plaintiff. The record reflects that Dr. Manale, an orthopedist, only examined the plaintiff twice. Both of these examinations took place after the plaintiff had been released to return to work and terminated. There is no indication that Dr. Manale treated the plaintiff. Therefore, the trial court properly declined to award plaintiff the costs of these examinations. Dr. Scrignar examined the plaintiff seven times, three times in November, 1984, December, 1985, February, 1986, October, 1986, and May, 1988the month before trial. Although he testified that he prescribed medication for the plaintiff, and gave him audio tapes to listen to for stress management, he stated that he could not call what he had done for the plaintiff "treatment". The trial court properly denied an award for the expenses incurred in seeing Dr. Scrignar.
For the foregoing reasons we amend the judgement of the trial court to delete that portion which gives defendants any credit against the worker's compensation benefits to be awarded plaintiff. We also amend the judgement to increase the amount of attorney's fees from $1,082.11 to $2,500.00. In all other respects the judgement of the trial court is affirmed.
AMENDED, AFFIRMED AS AMENDED.